# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CS-360, LLC,

       Plaintiff,

v.

U.S. DEPARTMENT OF VETERAN
AFFAIRS,

       Defendant.

Civil Action No. 11-00078 (CKK)

## MEMORANDUM OPINION
(March 6, 2012)

Plaintiff CS-360, LLC ("CS360") brings this action against the U.S. Department of Veteran Affairs (the "VA"), asserting three claims that, in one way or another, all challenge the VA's decision to deny CS360's application to be included in an online database of businesses eligible to participate in a veteran-owned small business program managed by the VA. Count I of the [1] Complaint alleges that the VA violated the Administrative Procedure Act because its denial of CS360's application was arbitrary and capricious. Count II alleges that the VA violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution by failing to permit applicants to appeal application decisions to an independent decision-maker and by using "inflammatory language" in the decision to deny CS360's application. Count III alleges that the VA is without statutory authority to issue the regulations at issue in this case.

There are currently two motions before the Court: CS360's [13] Motion for Summary Judgment and the VA's [15] Motion to Dismiss and/or for Summary Judgment ("Motion to Dismiss"). Upon careful consideration of the certified administrative record, the parties' submissions, the relevant authorities, and the record as a whole, the Court shall GRANT-IN-

1

PART and DENY-IN-PART CS360's [13] Motion for Summary Judgment and GRANT-IN-PART and DENY-IN-PART the VA's [15] Motion to Dismiss.  On Count I, the Court finds that the VA has failed to provide a satisfactory contemporaneous explanation for its decision to deny CS360's application and concludes that the best course is to **REMAND** the action to the VA for further consideration and explanation.  On Counts II and III, the Court concludes that CS360 has failed to state a plausible claim for relief.  Accordingly, those claims shall be **DISMISSED**.

## I. BACKGROUND

Unless otherwise noted, the following background is derived from the certified administrative record filed by the VA in this action.

### A.    Service-Disabled Veteran-Owned Small Businesses and the VA's VetBiz Vendor Information Pages Database

Congress enacted the Veterans Benefits, Health Care, and Information Technology Act of 2006, Pub. L. No. 109-461, §§ 502-03 (codified at 38 U.S.C. §§ 8127-28), to increase contracting opportunities for small businesses owned by service-disabled veterans.  *See* 38 U.S.C. § 8127(a).  To this end, Congress conferred upon the VA the authority to set aside certain government contracts for service-disabled veteran-owned small businesses ("SDVOSBs").  As part of this design, Congress required the Secretary of the VA to maintain a database of eligible small businesses.  *Id.* § 8127(f).

Responding to this statutory command, the VA maintains the VetBiz Vendor Information Pages ("VIP") database, an online "database of businesses eligible to participate in [the] VA's Veteran-owned Small Business Program," 38 C.F.R. § 74.1, which is accessible at http://www.VetBiz.gov.  By statute, "[a] small business concern may be awarded a contract [set aside for SDVOSBs] only if the small business concern and the veteran owner of the small

business concern are listed in the database of veteran-owned businesses maintained by the Secretary [of the VA]."  38 U.S.C. § 8127(e).

**B.      CS360's Application for Inclusion in the VetBiz VIP Database**

The Center for Veterans Enterprise (the "CVE"), a subdivision of the VA's Office of Small and Disadvantaged Business Utilization (the "OSDBU"), is charged with evaluating applications by small businesses seeking to be included in the VetBiz VIP database.  38 C.F.R. §§ 74.1, 74.11(a).  To qualify for inclusion, a small business "must be unconditionally owned and controlled by one or more eligible veterans, service-disabled veterans or surviving spouses." 38 C.F.R. § 74.2(a).  Thus, eligibility turns on the twin requirements of ownership and control.

On November 4, 2009, CS360, a limited liability company that was formed less than a month earlier, submitted an application for inclusion in the VetBiz VIP database.  VA00001, VA00006.  On February 1, 2010, the CVE notified CS360 that its application had been received and was being processed.  VA00004.  While the application was under review, CS360 was listed in the VetBiz VIP database on the basis of self-reporting but, despite this listing, CS360 had not been verified, certified, or licensed as an eligible SDVOSB during this interim period.

**C.      The Third-Party Protest of CS360's Eligibility**

On December 2, 2009, the VA announced that it was soliciting bids in connection with a construction project for a medical center in Lexington, Kentucky (the "Lexington Contract"), with the entire contract set aside for SDVOSBs.  VA00022.  CS360 competed for the Lexington Contract and was found to be the apparent low bidder on January 27, 2010.  VA00032.

By regulation, an offeror bidding on a contract may challenge another offeror's claimed status as an eligible SDVOSB by filing a third-party protest with the OSDBU.  48 C.F.R. § 819.307(c).  On January 29, 2010, the fourth lowest bidder on the Lexington Contract filed a

protest challenging CS360's SDVOSB eligibility.  VA00034-00036.  The essential thrust of the

protest was that CS360 was controlled not by a service-disabled veteran but instead by a non-

veteran-owned entity—specifically, a company called B&R Constructions Services ("B&R").

VA00035.

By regulation, the OSDBU is responsible for deciding whether to sustain a third-party

protest of this kind.  48 C.F.R. § 819.307(c).  On March 3, 2010, the OSDBU formally notified

CS360 of the protest and directed CS360 to submit evidence demonstrating that it is

unconditionally owned and controlled by a service-disabled veteran.  VA00058-00061.

On March 9, 2010, CS360 responded with a written submission and supporting

documentation.  VA00069-00179.  At the time of CS360's submission, two service-disabled

veterans, Walter A. Davis ("Davis") and James A. Blanco ("Blanco"), were designated as

CS360's sole Managing Members and each held a 25.5% individual interest in the company for a

combined 51% interest.  VA00092, VA00131.  Meanwhile, six non-veterans held interests that

combined to reflect the remaining 49%—namely, William R. Britt ("Britt"), David P. Vocci

("Vocci"), Edward E. Meadows ("Meadows"), Dana M. Borowy ("Borowy"), Benjamin L. Cox

("Cox"), and Gabriel R. Velicu ("Velicu").  VA00131.  In its written submission, CS360 argued

that it met the ownership requirement for SDVOSB eligibility because Davis and Blanco

collectively held a majority interest in the company.  VA00069.  Similarly, CS360 argued that it

met the control requirement because Davis held the highest position in CS360 and because Davis

and Blanco could together guide the decisions of the company under the terms of CS360's

Operating Agreement.  VA00070.  At that time, Section 4.01(a) of CS360's Operating

Agreement provided that a five-person Executive Committee comprised of two service-disabled

veterans (Davis and Blanco) and three non-veterans (Britt, Meadows, and Vocci) would manage

and direct the company by majority vote. VA00103. However, Section 4.01(a) also contemplated that Davis and Blanco could override the will of the three non-veterans on the Executive Committee, providing that "in cases in which the Managing Members are in agreement the decision of the Managing Members shall govern." VA00103. Finally, CS360 denied that it had an improper relationship with B&R, claiming that any "developmental assistance" provided by B&R to CS360 was in "strict compliance" with a Mentor-Protégé Agreement approved by the U.S. Department of Homeland Security ("DHS"). VA00070.

In addition to requesting materials from CS360, the OSDBU engaged an outside contractor to conduct an onsite examination of CS360. The contractor conducted the examination on April 26, 2010 and submitted its written report to the OSDBU on April 29, 2010. VA00371-00382. According to the written report, the contractor reviewed documentation and interviewed four individuals in connection with the examination. VA00372, VA00380-00382. Based upon its review, the contractor concluded that CS360 had failed to establish that Davis and Blanco unconditionally owned and controlled the company. VA00372. In terms of ownership, the contractor found that (1) the equity section of CS360's balance sheet identified six individuals who provided capital contributions to CS360, and Davis and Blanco were not included on this list; (2) there was no goodwill recorded on CS360's books and records to identify Davis and Blanco's alleged investment in the company; (3) Blanco was the owner of another entity that was also applying for inclusion in the VetBiz VIP database, contrary to regulations permitting only one company to be verified; (4) Blanco's separate entity was also certified by the Small Business Administration ("SBA") in a program that required him to be involved full-time in the day-to-day management of that entity, preventing him from being involved in the day-to-day operations of CS360. VA00372-00374. In terms of control, the

contractor took into account that (1) CS360's Operating Agreement was silent as to management percentages; (2) the Operating Agreement stated that the Executive Committee was not required to devote any particular amount of time to the performance of their duties and were able to delegate their duties to others; (3) Blanco was paid as a consultant; (4) while Davis performed the "vast amount of functions" for CS360, it was unclear whether he "fully managed the majority of the day to day operations"; and (5) a review of four contracts revealed that Davis and Blanco only had oversight and signing authority over one contract.  VA00374.

Also included in the contractor's onsite examination report is a summary of statements made by the four interviewees.  According to the report, Davis stated that he made no capital contribution to CS360 and characterized his contribution as his "expertise."  VA00382. Similarly, Vocci reportedly stated that Davis and Blanco's contributions to the company were their status as service-disabled veterans.  VA00381.  In addition, Meadows indicated that CS360 was formed to solicit contracts from the VA and other agencies that were unavailable to B&R because it was not eligible for SDVOSB status and expressed his understanding that Davis and Blanco's ownership interests would be reduced as the company became more profitable. VA00380.  Meanwhile, all four interviewees consistently indicated that Davis reported to the office every day and had meaningful responsibilities, while Blanco reported to the office one day a week and was otherwise occupied with a separate entity that he owned.  VA00380-00382.

On April 30, 2010, the OSDBU issued its final determination sustaining the third-party protest.  VA00383-00387.  Although that determination is not directly challenged in this action, it sets the scene for later administrative action.  Based on the totality of the evidence, the OSDBU found that CS360 had failed to establish its eligibility for SDVOSB status.  VA00383. The basis for the OSDBU's decision was narrow.  As an initial matter, the OSDBU conceded

6

that CS360 had submitted evidence supporting its contention that Davis and Blanco met the

ownership requirement because they held a majority interest in the company.  VA00386.

However, the OSDBU concluded that CS360 failed to show that Davis and Blanco met the

control requirement for a single reason.  VA00386.  Specifically, the OSDBU concluded that

Section 4.01(a) of the Operating Agreement could allow non-veterans to control the decisions of

CS360 because the three non-veteran members of the Executive Committee could join with

either Davis or Blanco to override the will of the other.  VA00387.  For this reason, the OSDBU

found that CS360 failed to demonstrate its eligibility and informed the company that its profile

would be removed from the VetBiz VIP database.  VA00387.  From that point forward, CS360

has been prohibited from submitting offers set aside for SDVOSBs until "it demonstrates that it

has overcome the reasons for the determination of ineligibility."  48 C.F.R. § 819.307(c)(3).

### D.    CS360's Attempts to Remedy the Problems Identified by the OSDBU

On May 6, 2010, CS360 responded in writing to the OSDBU's decision to sustain the

third-party protest.  VA00390-00391.  Included with CS360's letter was a First Amended

Operating Agreement, effective as of May 6, 2010, and a redline to the prior version.  VA00392-

00479.  According to CS360's letter, the First Amended Operating Agreement was designed to

"resolve the concerns" identified by the ODSBU.  VA00390.  Specifically, Section 4.01(a)

provided that "[t]he business affairs of the Company shall be managed by or under the direction

of the Managing Members" and that "both Managing Members shall be required to form a

quorum and to exercise any powers of the Company."  VA00451.

CS360 did not stop there.  On May 12, 2012, it executed a Second Amended Operating

Agreement making additional changes to its management structure.  VA00480-00523.  Most

notably, through the Second Amended Operating Agreement, Blanco formally withdrew as a

Member of CS360, leaving Davis as the sole Managing Member.  VA00523.   From that point

forward, Davis has held a 51% ownership interest in CS360, with six non-veterans (Borowy,

Britt, Cox, Meadows, Velicu, and Vocci) holding the remaining 49%.  VA00522.  Under Section

4.01(a) of the Second Amended Operating Agreement, Davis, as the sole Managing Member,

"shall exercise all powers of the Company in accordance with [the] Agreement and do such

lawful acts and things as are not by law or by [the] Agreement directed or required to be

exercised or done by the Members."  VA00495.

On May 21, 2010, CS360 sent a copy of the Second Amended Operating Agreement to

the OSDBU along with a two-page letter.[1]  VA00524-00525.  In its letter, CS360 took the

position that the Second Amended Operating Agreement "placed all decision-making powers

with Walter Davis . . . who now owns 51% of the company."  VA00524.  According to CS360,

the Second Amended Operating "addressed and rectified" the OSDBU's concerns and CS360

"request[ed] a determination that [it] ha[d] demonstrated to the VA that it ha[d] overcome the

reasons for the initial ruling of ineligibility."  VA00524.

On June 21, 2010, the OSDBU responded to CS360's submissions.  VA00530-00531.

The OSDBU simply noted that, by regulation, its decision sustaining the protest was final and

that the changes made by CS360 to its management structure would be considered in connection

with CS360's application for inclusion in the VetBiz VIP database, which remained pending.

VA00530-00531.

---

[1]   While the record is not clear, CS360 also may have sent a copy of the Second Amended
Operating Agreement to the OSDBU on May 12, 2010.

**E.**     **The CVE Denies CS360's Application for Inclusion in the VetBiz VIP Database**

Turning now to the decision that is at the heart of this case, the CVE denied CS360's application for inclusion in the VetBiz VIP database on June 30, 2010 (the "Initial Determination").  VA00532-00537.  According to its six-page Initial Determination, the CVE reviewed CS360's application, the Second Amended Operating Agreement, CS360's written submission dated March 9, 2010, and the results of the onsite examination.  VA00532.  Based on this review, the CVE ultimately concluded that CS360 had established the ownership prong of the eligibility analysis, but found that several factors "materially affect[ed]" Davis' control over CS360.  VA00532.

As an initial matter, the CVE conceded that the concern that led the OSDBU to sustain the third-party status protest—namely, that Section 4.01(a) of the Operating Agreement could allow non-veterans to control the decisions of CS360 because the three non-veteran members of the Executive Committee could join with either Davis or Blanco to override the will of the other—"at least on paper, ha[d] been corrected."  VA00533.  In particular, the CVE acknowledged that because the Second Amended Operating Agreement eliminated the Executive Committee and designated a single service-disabled veteran as the sole Managing Member, there was no longer a concern that "non-[v]eterans could act in concert with one [service-disabled veteran] to override the other [service-disabled veteran]."  VA00533.

Nonetheless, the CVE proceeded to identify four factors that it concluded prevented it from finding that a service-disabled veteran sufficiently controlled CS360.  First, the CVE claimed that Section 4.01(c) of the Second Amended Operating Agreement "provides that 'Managing Members shall not be required to devote any particular amount of time to the performance of their duties and may delegate their responsibilities as provided in this

agreement.'" VA00533.  According to the CVE, this ran afoul of regulations "requir[ing] that

one or more service-disabled [v]eterans who manage the firm must devote full-time to the

applicant or participant during normal working hours of firms in the same or similar line of

business." VA00533.  However, in expressing this concern, it appears that the CVE mistakenly

relied upon the First Amended Operating Agreement, which includes the quoted language, and

not the Second Amended Operating Agreement, which does not.  VA00452, VA00569.

 Second, Section 4.03 of the Second Amended Operating Agreement provides that "[t]he

Managing Member may delegate to any Administrator or other agent such power and authority

as the Managing Member deems advisable, subject to the authority of the Managing Member."

VA00569-00570.  The CVE found that this provision "on its face raises the issue of control

where it provides that the Managing Member may delegate to any Administrator or other agent

power and authority as the Managing Member may deem advisable including (without

limitation) the power and authority to manage the day-to-day operations of the Company."

VA00533.  Although the CVE conceded that Davis "essentially works full-time at the firm," the

Initial Determination does not explain why this would be insufficient.  VA0533.

 Third, turning to the results of the onsite examination, the CVE found that "deeper

organizational structural flaws [were] fatal to the application." VA00533.  Although it is not

entirely clear from the face of the Initial Determination, it appears that the "structural flaws" the

CVE had in mind relate to the extent of CS360's economic dependence on B&R.  By regulation,

the CVE may conclude that a small business fails to comply with the control requirement when

"[b]usiness relationships exist with non-veterans or entities which cause such dependence that

the applicant cannot exercise independent business judgment without great economic risk." 38

C.F.R. § 74.4(i)(4).  Citing this provision, the CVE found that, "[s]ince [CS360] has only one

full-time employee, . . . the inexorable conclusion is that CS360 cannot perform any contract

without B&R agreeing and providing very nearly all the resources necessary to perform any

work." VA00534.  In other words, the CVE found that CS360's resources were insufficient to

permit it to effectively exercise independent judgment.

Fourth, noting that its review extends beyond "formalities" and examines the "practical

realities of how the applicant concern is actually run on a daily basis," the CVE concluded that

CS360 was created as a "sham" entity designed to solicit contracts set aside for SDVOSBs on

B&R's behalf.  VA00533-00534.  In support of this conclusion, the CVE cited the following: (1)

B&R is "co-located" with CS360; (2) CS360's "minority owners" were "all employees of

B&R"; (3) Davis was CS360's "only paid employee"; (4) "B&R provided all the financing for

starting up" CS360; (5) Davis "provided no capital" in the formation of CS360; and (6) during

the onsite examination, Vocci indicated that  Davis' "contribution to [CS360] was [his] [service-

disabled veteran] status" and that "B&R would furnish all the people necessary to do work for

CS360."  VA00533-00534.  Based on this record, the CVE found that "[t]he purpose for creating

CS360 was solely to bring to life a SDVOSB for B&R to seek work from VA and possibly other

agencies on SDVOSB set-asides."  VA00534.

After reaching this conclusion about the purpose behind the formation of CS360, the

Initial Determination proceeds to explain why the CVE found that the Mentor-Protégé

Agreement entered into between CS360 and B&R, and approved by DHS, did not warrant a

different result.  VA00534-00535.  Initially, the CVE provided that the "VA is not bound by [the

agreement's] terms" because it "has its own regulatory provisions on mentor-protégé

agreements" that became final in January 2010.  VA00535 (citing 48 C.F.R. §§ 819.7101-

819.7115).  In any event, the CVE found that the Mentor-Protégé Agreement "does not support

control" because "[t]he obvious intent . . . is to attempt to create a paper record justifying B&R providing all the resources necessary for [CS360's] operations." VA00534-00535. In support of its conclusion as to the "obvious intent" of the Mentor-Protégé Agreement, the CVE cited the following: (1) the relationship between CS360 and B&R went beyond "merely hiring some of the mentor's employees on a temporary basis," and instead involved "B&R provid[ing] all but one person as key personnel and [being] responsible for virtually the *entire* operation of the protégé"; (2) the site examination indicated that "no training is provided as all the employees work for B&R and Mr. Davis evidently does not require training as he was selected to be the [service-disabled] veteran because of his expertise"; (3) B&R charged CS360 for all of the resources provided with the exception of a rent-free apartment used by Davis; and (4) there was no evidence that CS360 was "separately developing a business operation." VA00535 (emphasis in original). On this basis, the CVE concluded that "B&R [was] solely funding [CS360] and then paying itself back for the use of these resources," thus "evidenc[ing] a sham transaction and organization." VA00536.

Based on this foundation, the CVE denied CS360's application for inclusion in the VetBiz VIP database and informed the company that it would no longer be listed in the database. VA00536. CS360 was advised that it could request reconsideration of the Initial Determination and the VA invited CS360 to submit "a letter of explanation, signed by all owners, that clearly and conclusively addresses each of the issues raised in this denial," accompanied by "official corporate documentation substantiating each claim made in [the] request." VA00536.

**F.     CS360 Requests Reconsideration of the Initial Determination**

By regulation, "[a]n applicant may request that the Director, CVE, reconsider his or her decision to deny an application by filing a request for reconsideration with CVE." 38 C.F.R. § 74.13(a). On August 26, 2010, CS360 submitted its thirteen-page Request for Reconsideration.

VA00538-00700.  As it was invited to do, CS360's Request for Reconsideration purports to "provide [the CVE] with additional information relating to CS360's operations and [to] clarify certain other information contained in its application."  VA00539.  The Request for Reconsideration is signed by Davis, affirmed under the penalty of perjury, and certified by a public notary.  VA00550.  It responds to each of the four considerations identified by the CVE as the basis for its Initial Determination.

First, CS360 noted that the language identified by the CVE in Section 4.01(c) had already been removed from the Second Amended Operating Agreement before the CVE issued its Initial Determination and therefore "should not be the basis of any concerns."  VA00540.

Second, CS360 responded that the delegation authority in Section 4.03 of the Second Amended Operating Agreement was designed "merely to allow [the Managing Member] to appoint individuals to perform certain functions for CS360" and that "[s]uch appointments are at all times revocable and subject to [the Managing Member's] authority."  VA00540-00541.  In addition, Davis represented that he "ha[d] not made any designation under the authority granted to [him] by Section 4.03."  VA00541.

Third, CS360 explained why its staffing complement and resources were consistent with its status as a relatively new company and were sufficient to allow it to effectively exercise independent judgment.  Purporting to correct the CVE's contention that CS360 maintained only one full-time employee, CS360 stated that it then had two full-time employees—Davis and Cox, the latter of whom was employed as a Senior Project Manager.  VA00544.  In addition, CS360 claimed that it had an extant "consulting arrangement" with one individual and previously had relationships with other consultants and sub-consultants, but that those relationships "were terminated due to the cost reductions necessitated by CS360's inability to obtain verification as a

SDVOSB." VA00544. According to CS360, its staffing levels were "consistent with its start-up nature," its "intention [was] to hire employees to staff particular jobs as work comes in and contracts are awarded," and "[i]t would not make business sense to fully staff CS360 until such time as it has the work to justify the staffing." VA00544. Moreover, CS360 disclaimed any intention to "rely on B&R to provide these resources," contending that B&R's contributions would be limited to "administrative and technical assistance" provided under the parties' Mentor-Protégé Agreement and would not include "work done to actually service contracts." VA00544.

Fourth, CS360 responded to the CVE's claim that it was formed solely as a "sham" to permit B&R to obtain contracts set aside for SDVOSBs. CS360 sought to refute several of the grounds cited by the CVE for reaching this conclusion. Without disputing that the minority non-veteran owners of CS360 were also employees of B&R, CS360 asserted that only three of the six non-veterans that made capital contributions to CS360 (Britt, Meadows, and Vocci) held an actual membership interest in B&R and that other individuals holding a membership interest in B&R held no interest whatsoever in CS360. VA00533. More broadly, it disputed the CVE's assertion that B&R provided all the financing for the formation of CS360, noting that "B&R [itself] provided no capital to, and has no ownership interest in, CS360." VA00543 (capitalization omitted). Similarly, CS360 contested the suggestion that Davis made no contribution to the firm simply because he made no capital contribution, noting that he "took a substantial financial risk in leaving [his] previous provision [sic]" and harbored "the additional risk associated with being a principal in a construction company, including potential risks associated with bonding and letter of credit requirements." VA00542. In any event, CS360 took the position that capital contributions have "no impact" on the control of CS360 because the

Second Amended Operating Agreement makes it clear that Davis controlled the decisions of the company regardless of capital contributions. VA00542. On this point, CS360 emphasized that Section 3.06 of the Second Operating Agreement states that "no Member shall have the right . . . [to] the repayment of its Capital Contributions." VA00542, VA00567. Furthermore, as described above, CS360 claimed that, instead of employing one full-time employee, it had two full-time employees and past and present arrangements with consultants and that B&R's contributions would be limited to "administrative and technical assistance" provided under the parties' Mentor-Protégé Agreement and would not include "work done to actually service contracts." VA00533-00544.

Turning to the CVE's treatment of the Mentor-Protégé Agreement between CS360 and B&R, CS360 conceded that "the VA is not obligated to recognize the Mentor-Protégé Agreement approved by DHS." VA00545. Nonetheless, CS360 argued that it was improper "to characterize the Agreement as a sham when the Agreement was approved by the DHS." VA00545. Responding to the CVE's contention that CS360 should have sought approval through the VA's procedures, CS360 noted that "the program was not available at the time the process was initiated with the DHS." VA00545. More generally, CS360 claimed that the CVE had mischaracterized the relationship between CS360 and B&R, contending that "B&R's primary assistance to CS360 has been in assisting in preparing proposals for the purpose of acquiring contracts and enhancing CS360's ability to develop its own business operation." VA00545. Again, it asserted that "B&R has not been and will not be responsible for the servicing of contracts." VA00545. CS360 also denied that B&R provided no training to Davis, claiming that, despite Davis' expertise in other areas, B&R was providing Davis "with training related to the administration and management of a construction business," including "training

15

and direction in business software, business accounting, project management software, proposal writing and job safety programs." VA00545. CS360 also contended that "B&R does not, and has never, charged CS360 for rent, support personnel, and office expenses," and "does not recover any profit from this arrangement." VA00546. Finally, CS360 denied that there was no evidence that it was developing a separate business operation and, in support, it outlined five specific examples of CS360's "efforts to develop its business, including in areas that are outside of the usual areas of operation of B&R." VA00547. According to CS360, these areas include "civil, general construction, and project management projects." VA00547.

### G.      The CVE Denies CS360's Request for Reconsideration

By regulation, when presented with a request for reconsideration, the CVE "may either approve the application, deny it on the same grounds as the original decision, or deny it on other grounds." 38 C.F.R. § 74.13(b). On November 2, 2010, the CVE denied CS360's Request for Reconsideration (the "Final Decision"), concluding that CS360 did "not satisfy the requirements" for inclusion in the VetBiz VIP database. VA00701-00704. The four-page Final Decision is broken into five parts.

First, the CVE asserted that CS360's Second Amended Operating Agreement "continues to contain indicators of impropriety." VA00701. Claiming that it was "difficult to identify substantive changes from the previous version," even though many of those changes were identified in CS360's written submissions, the CVE "question[ed] how [CS360] could have implemented and/or effected these changes as insufficient time elapsed between the changes in this submission and the version submitted prior to this request." VA00701. In particular, the CVE expressed concern that the provisions governing Managing Members were "revised" and one Managing Member (Blanco) was removed "wholesale" on such a short timeframe.

VA00701.  Without further explanation, the CVE asserted that "[w]hile business re-organization is normally squarely within the province of the owners, these changes evince an intent solely to bring CS360 within the letter of the regulation as opposed to having real meaning or business purpose."  VA00701.

Second, with respect to capital contributions, the CVE stated that it "finds it unreasonable to conclude that any rational person, or group of persons, would personally fund a start-up construction concern with nearly half a million dollars and relinquish total control over that concern, including long-term or strategic policy, and its profit."  VA00702.  Without providing any particulars, the CVE then stated that it "will go beyond the formalities of business ownership and titles and examine how the applicant concern is actually run."  VA00702.

Third, the CVE stated, in a single sentence, that "[i]rrespective of whether the start-up capital was furnished by B&R . . . or individuals employed or otherwise enmeshed with B&R, CVE finds the same underlying implausibility as previously stated."  VA00702.

Fourth, the CVE found that CS360 "failed to provide any supporting corporate documentation to substantiate [its] claims that [it] has the ability and intention to provide non-B&R affiliated employees."  VA00702.  The CVE does not address whether or why CS360's Request for Reconsideration, sworn and notarized, was insufficient.  The CVE then proceeded to "take administrative notice" of a government report criticising SDVOSBs with limited resources, but did not explain how the report might relate to CS360 in particular.  VA00702.  Finally, the CVE contended that CS360 "bid on multi-million dollar construction projects which belies [its] description of [itself] as a start-up, giving [sic] the existence of [its] relationship to the established large business B&R."  VA00702.

Fifth, the CVE stated that it "reviewed the exhibits provided [by CS360] including [sic] [its] relationship with B&R and of [sic] [its] efforts to build [its] business." VA00702. Without further explanation, CVE asserted that CS360's "intertwinement with B&R . . . continues to demonstrate to CVE a relationship impeding independent judgment and threatened economic risk." VA00702. The CVE apparently found CS360's specific examples of its efforts to develop a separate business concern insufficient. Although it conceded that those examples "include[d] several low dollar contracts and proposals that are arguably consistent with a start-up business," the CVE noted that "absent from [CS360's] submission are any of the multi-million dollar bids that it ha[s] sought with VA that . . . [CS360] cannot conceivably have garnered the resources to perform without B&R having a significant role." VA00702.

Ultimately, the CVE "conclude[d] that [CS360's] arguments and exhibits fail to substantiate [its] claim that [a service-disabled veteran] controls both the day-to-day management and administration of business operations and strategic policy setting of [CS360]." VA00703. The CVE characterized an unidentified universe of remarks regarding CS360's claims to eligibility as "conclusory" and suggested, without further explanation, that "[t]he results of the site examination of [CS360] and the statements made by B&R/CS360 owners/employees on April 26, 2010, bolster CVE's conclusions." VA00701, VA00703. On these grounds, the CVE denied CS360's application for inclusion in the VetBiz VIP database and informed CS360 that its "profile [would] remain out of public view." VA00703.

### H.     The Commencement of this Action

CS360 commenced this action on January 12, 2011. *See* Compl., ECF No. [1]. Count I of the Complaint alleges that the VA violated the Administrative Procedure Act because its denial of CS360's application for inclusion in the VetBiz VIP database was arbitrary and

capricious. *Id.* ¶¶ 47-48. Count II alleges that the VA violated the Due Process Clause of the

Fourteenth Amendment of the United States Constitution because CS360 "has a property interest

in the economic benefits that VA-approved status would bring" and the VA "deprived [CS360]

of that SDVOSB status with no procedure or process for independent review of the decision."

*Id.* ¶ 50. Count II also alleges that the VA's use of "inflammatory language" in its denial

decisions "constitutes a deprivation of [CS360's] property or the liberty to enjoy rights which [it]

would otherwise enjoy." *Id.* ¶ 51. Finally, Count III alleges that the SBA, and not the VA, has

the exclusive authority to certify SDVOSBs and that the VA has "no statutory authority to issue

regulations . . . to certify SDVOSBs." *Id.* ¶ 53.

CS360 filed its Motion for Summary Judgment on July 7, 2011, and the VA filed its

Motion to Dismiss the same day. *See* Pl.'s Mot. For Summ. J. & Mem. of P. & A., ECF No.

[13]; Def.'s Mem. in Supp. of its Mot. for Summ. J. & to Dismiss ("Def.'s MTD Mem."), ECF

No. [15-2]. The parties proceeded to brief both motions in accordance with the schedule set by

the Court. *See* Pl.'s Cross Opp'n to Def.'s Cross Mot. for Summ. J. & Opp'n to Dismiss ("Pl.'s

MTD Opp'n"), ECF No. [18]; Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s MSJ Opp'n"),

ECF No. [19]; Def.'s Reply ("Def.'s MTD Reply"), ECF No. [23]; Pl.'s Cross Reply to Def.'s

Cross-Opp'n to Pl.'s Cross-Mot. for Summ. J., ECF No. [24]. Both motions are now fully

briefed and ripe for a decision. In an exercise of its discretion, the Court finds that holding an

oral argument on the motions would not be of assistance in rendering a decision. *See* LCvR 7(f).

## II. DISCUSSION

CS360 asserts three claims in this action, each of which challenges, in one way or

another, the VA's decision to deny CS360's application to be included in the VetBiz VIP

database identifying businesses eligible to participate in the veteran-owned small business

program managed by the VA.  Count I of the [1] Complaint alleges that the VA violated the

Administrative Procedure Act because the CVE's denial of CS360's application was arbitrary

and capricious.  Count II alleges that the VA violated the Due Process Clause of the Fourteenth

Amendment of the United States Constitution.  Count III alleges that the VA is without statutory

authority to issue the regulations at issue in this case.  On Count I, the Court finds that the VA

has failed to provide a satisfactory contemporaneous explanation for its decision to deny

CS360's application and concludes that the best course is to **REMAND** the action to the VA for

further consideration and explanation.  On Counts II and III, the Court concludes that CS360 has

failed to state a plausible claim for relief.  Accordingly, those claims shall be **DISMISSED**.

A.      **Count I: Violation of the Administrative Procedure Act**

Count I alleges that the VA violated the Administrative Procedure Act ("APA") because

its denial of CS360's application for inclusion in the VetBiz VIP database was arbitrary and

capricious.  Compl. ¶¶ 47-48.  The Court concludes that the VA has failed to provide a

satisfactory contemporaneous explanation for its decision to deny CS360's application and

concludes that the best course is to **REMAND** the action to the VA for further consideration and

explanation.

1.      **Legal Standard**

Under the "arbitrary or capricious" standard, the reviewing court must "set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  CS360, as the party challenging

the agency action, bears the burden of proof.  *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*,

575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. Fed. Aviation Admin.*, 292

F.3d 261, 271 (D.C. Cir. 2002)).  In assessing the merits of CS360's challenge, the Court begins

with the presumption that the VA's action was valid.  *Grid Radio v. Fed. Commc'ns Comm'n*, 278 F.3d 1314, 1322 (D.C. Cir.), *cert. denied*, 537 U.S. 815 (2002).

Agency action must generally be affirmed on the grounds originally stated by the agency; a reviewing court may not attempt to supply "a reasoned basis for the agency's action that the agency itself has not given."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Nor may counsel's "*post hoc* rationalizations," offered for the first time on judicial review, substitute for an agency's obligation to articulate a valid rationale in the first instance.  *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005).  Consistent with these principles, judicial review is typically confined to the administrative record before the agency at the time the decision was made.  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

In order to avoid a finding that the challenged agency action was arbitrary or capricious, the "agency must [have] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal quotation marks omitted).  In articulating the reason for its action, the agency "must have provided a 'rational connection between the facts found and the choice made.'"  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  An agency's decision may be said to be arbitrary or capricious if any of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend

the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment.
*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *accord Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).

This standard of review is highly deferential to the agency; a court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). That is, it is not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). At bottom, the reviewing court is not entitled to substitute its judgment for that of the agency. *Overton Park*, 401 U.S. at 416.

In evaluating agency action under the "arbitrary or capricious" standard, the reviewing court must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Just as the burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action, so too must that party establish that the errors ascribed were prejudicial. *Jicarilla Apache Nation*, 613 F.3d at 1121 (citing *PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004)). The question of whether an error was prejudicial is necessarily contextual, and courts must proceed with a case-specific application based upon an examination of the entire record. *Jicarilla Apache Nation*, 613 F.3d at 1121. However, where the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings below, the error is not prejudicial, and it would be senseless to vacate and remand for further proceedings. *Id.*

22

###### 2.      Analysis

By Congressional design, "[a] small business concern may be awarded a contract [set aside for SDVOSBs] only if the small business concern and the veteran owner of the small business concern are listed in the [VetBiz VIP] database." 38 U.S.C. § 8127(e).  To be eligible for inclusion in the database, a business must be both "owned" and "controlled" by a service-disabled veteran. *Id.* § 8127(f)(4)(A); 38 C.F.R. § 74.1.  In this case, in denying CS360's application for inclusion in the VetBiz VIP database, the VA's CVE determined that CS360 had established the ownership prong of the eligibility analysis, but found that it had not established that Davis exercised sufficient "control" over the company.  VA00532, VA00703.  Under the control prong, when the applicant is a limited liability company like CS360, a service-disabled veteran must control "both the day-to-day management and long-term decision-making authority" for the company.  38 C.F.R. § 74.4(a).  For the reasons set forth below, the Court concludes that the VA has failed to provide a satisfactory contemporaneous explanation for its decision to deny CS360's application on this basis and concludes that the best course is to **REMAND** the action to the VA for further consideration and explanation.

###### i.      The Relationship Between the Initial Determination and the Final Decision

This Court's review function under the APA is limited to "final agency action."  5 U.S.C. § 704.  Nonetheless, where, as here, the agency's decision comes to the Court upon a denial of a request for reconsideration, the party seeking review generally may "challenge that denial as well as the agency's original order."  *Clifton Power Corp. v. Fed. Energy Regulatory Comm'n*, 294 F.3d 108, 110 (D.C. Cir. 2002).  Consistent with this approach, before this Court, both CS360 and the VA have addressed the propriety of the CVE's decision to deny CS360's application for inclusion in the VetBiz VIP database with reference to both the Initial Determination denying the

application and the Final Decision denying CS360's Request for Reconsideration.  However, complicating the Court's review is the uncertain relationship between the Initial Determination and the Final Decision.  Indeed, it is not clear from the Final Decision whether the CVE intended to retain, abandon, or modify certain grounds for denying CS360's application that were articulated in the Initial Determination.  In short, the precise grounds upon which the VA actually intended to rely are not free from doubt.  Two examples will suffice.

First, in the Initial Determination, the CVE claimed that Section 4.01(c) of the Second Amended Operating Agreement "provides that 'Managing Members shall not be required to devote any particular amount of time to the performance of their duties and may delegate their responsibilities as provided in this agreement.'"  VA00533.  According to the CVE, this ran afoul of regulations "requir[ing] that one or more service-disabled [v]eterans who manage the firm must devote full-time to the applicant or participant during normal working hours of firms in the same or similar line of business."  VA00533.  However, in expressing this concern, it appears that the CVE mistakenly relied upon the First Amended Operating Agreement, which includes the quoted language, and not the Second Amended Operating Agreement, which does not.  VA00452, VA00569.  Accordingly, in its Request for Reconsideration, CS360 noted that the language in Section 4.01(c) had already been removed from the Second Amended Operating Agreement before the CVE issued its Initial Determination.  VA00540.  Despite this, the CVE failed to directly address the matter in its Final Decision, although it claimed in passing that "it was difficult to identify substantive changes from the previous version."  VA00701.  For this reason, it is not clear to the Court whether or not the VA still intended to rely upon the cited language as an independent basis for denying CS360's application.  This is no mere technicality,

as such reliance might very well be in error because the record reveals that CS360 had removed

the language and notified the VA of the change prior to the Initial Determination.

Second, in denying CS360's application in the Initial Determination, the CVE relied in

part upon Section 4.03 of the Second Amended Operating Agreement, which provides that "[t]he

Managing Member may delegate to any Administrator or other agent such power and authority

as the Managing Member deems advisable, subject to the authority of the Managing Member."

VA00569-00570.  In the Initial Determination, the CVE found that this provision "on its face

raises the issue of control where it provides that the Managing Member may delegate to any

Administrator or other agent power and authority as the Managing Member may deem advisable

including (without limitation) the power and authority to manage the day-to-day operations of

the Company."  VA00533.  In its Request for Reconsideration, CS360 argued that the provision

was designed "merely to allow [the Managing Member] to appoint individuals to perform certain

functions for CS360" and that "[s]uch appointments are at all times revocable and subject to [the

Managing Member's] authority."  VA00540-00541.  In addition, Davis represented that he

"ha[d] not made any designation under the authority granted to [him] by Section 4.03."

VA00541.  Meanwhile, the Final Decision does not indicate, one way or another, whether the

CVE continued to believe that Section 4.03 of the Second Operating Agreement continued to

supply an independent basis for the denial of CS360's application.  Accordingly, the Court is left

in the dark as to whether this consideration remained a basis for the agency's ultimate decision.

In exercising its judicial review function, this Court's task is to determine whether the

VA "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."

*PPL Wallingford*, 419 F.3d at 1198 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal

quotation marks omitted).  But given the uncertain relationship between the Initial Determination

and the Final Decision, it is not even clear to this Court precisely what the VA's explanation is for its ultimate action. Absent clarification, the Court is unable to exercise the role envisioned by Congress when it enacted the APA.

### ii.    Generalized and Ambiguous Explanations

Likewise, several of the grounds cited by the CVE as a basis for denying CS360's application for inclusion in the VetBiz VIP database are described in such generalized and ambiguous terms that the Court is essentially left to guess as to the precise basis for the agency's decision. Here, three examples will suffice.

First, the CVE's Final Decision states that CS360's efforts to modify its operating documents to address the concerns raised by the agency "evince an intent solely to bring CS360 within the letter of the regulation as opposed to having real meaning or purpose." VA00701. In support, the CVE claimed that CS360's Second Amended Operating Agreement "continues to contain indicators of impropriety," VA00701, but the CVE neither identified with any meaningful measure of clarity what those "indicators" might be nor articulated how they were evidenced by the record before the agency. So far as the Court can tell, the only specific "indicator" relied upon by the CVE in its Final Decision is the timing of CS360's amendments, a matter addressed below. To the extent the CVE intended to rely on other "indicators of impropriety," it has not identified them in such a manner that would allow this Court to take them into account in evaluating the soundness of the Final Decision. Indeed, the CVE's chosen approach is particularly problematic because the CVE concedes in the Final Decision that "business re-organization is normally squarely within the province of the owners." VA00701. And yet the CVE's Final Decision makes no meaningful attempt to explain, with specifics relevant to CS360, why CS360's efforts fall outside the normal case.

Second, in concluding that CS360 was created as a "sham" entity designed to solicit contracts set aside for SDVOSBs on B&R's behalf, the CVE's Initial Determination relied in no small part on the fact that Davis provided no capital contribution in CS360's formation. VA00533-00534. In its Request for Reconsideration, CS360 took the position that capital contributions have "no impact" on the control of CS360 because the Second Amended Operating Agreement makes it clear that Davis controls the decisions of the company regardless of capital contributions. VA00542-000543. In its Final Decision, the CVE responded to these arguments simply by asserting that it "finds it unreasonable to conclude that any rational person, or group of persons, would personally fund a start-up construction concern with nearly a half a million dollars and relinquish total control over that concern, including long-term or strategic policy, and its profit." VA00702. This explanation reduces to little more than the CVE's conclusory assertion that CS360's formation was a "sham."[2] The CVE's Final Decision offers no meaningful measure of detail and cites to no specific evidence. For instance, although the CVE asserts in broad terms that it will "go beyond the formalities of business ownership and titles and examine how the applicant concern is actually run," VA00702, the Final Decision provides no particulars. Given the brevity of the agency's explanation, the Court is not in a position to presume that the CVE's reference to the expected conduct of "any rational person" is a product of agency expertise. Despite the highly deferential standard of review, the CVE must provide a reasoned explanation for its conclusion and this Court is not free to accept the agency's *ipse dixit* that CS360 was formed as a "sham." *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000).

---

[2] In defending its decision before this Court, the VA resorts to similar generalities, claiming that "CS360 was drafting the Operating Agreement with the sole purpose of satisfying the VA, not to establish its business relationship." Def.'s MSJ Opp'n at 5. However, even the VA characterizes this as an "impression." *Id.*

Third, the CVE's Initial Determination relied on its finding that "B&R provided all the financing for starting up" CS360.  VA00533-00534.  When CS360 disputed this assertion, the CVE responded in its Final Decision that, "[i]rrespective of whether the start-up capital was furnished by B&R . . . or individuals employed or otherwise enmeshed with B&R, CVE finds the same underlying implausibility as previously stated."  VA00702.  As an initial matter, implicit in this phrasing is a concession that the Initial Determination went too far in stating that "B&R provided all the financing for starting up" CS360.[3]  VA00553-00534.  As the CVE now appears to acknowledge, there is nothing in the record to suggest that any capital was contributed directly by B&R itself.  In any event, the CVE's assertion in the Final Decision that the "underlying implausibility" remains the same even if the capital was contributed by employees or members of B&R is so brief and unilluminating that the Court is left in the dark as to what the agency actually meant by the use of this language.  To the extent the CVE intended to suggest that the "underlying implausibility" is that "it is unreasonable to conclude that any rational person, or group of persons, would personally fund a start-up construction concern . . . and then relinquish total control over that concern," VA00702, the Court has already found that this cursory statement fails to provide a sufficiently reasoned explanation.  To the extent the CVE intended to rely upon some other "underlying implausibility," it has failed to identify it with sufficient particularity to permit this Court to exercise its function of judicial review.

### iii.    New Explanations

When reviewing an agency's final action under the APA, a reviewing court must disregard "*post hoc* rationalizations" that were not articulated on the administrative level.  *El Rio*

---

[3]  Such a conclusion is not entirely free from doubt because, as described above, the VA has been less than clear in articulating the relationship between the Initial Determination and the Final Decision.

*Santa Cruz*, 396 F.3d at 1276.  Accordingly, equally problematic to the VA's case are the new

explanations for its ultimate conclusion that the agency proffers before this Court.  For example,

Section 3.06 of the Second Amended Operating Agreement provides that "no Member shall have

the right . . . [to] repayment of its Capital Contributions."  VA00542, VA00567.  In its Request

for Reconsideration, CS360 provided sworn documentation that "[t]he capital contributions have

been placed in a bank account" and that Davis "alone control[s] the bank account and [has] the

authority to write checks out of the bank account."  VA00542.  According to CS360, this

evidences that "no other Member is in a position to withdraw their capital contributions in the

event they do not agree with a decision [Davis] make[s] with respect to the operation of CS360."

*Id.*  Before this Court, the VA responds that, while it "found that [] Mr. Davis may in fact have

signature authority over the official bank account, he could not control what support B&R would

be willing to provide or when."  Def.'s MTD Reply at 3-4.  Conspicuously absent from the

memorandum in which the VA makes this argument is any citation to the Initial Determination

or Final Decision addressing Davis' control over the bank account because, indeed, there is none.

The Final Decision makes no finding with respect to Davis' control over the bank account and,

by extension, CS360's capital base.  Nor does the Final Decision explain why this evidence of

control is outweighed by other countervailing considerations.

Furthermore, responding to the Initial Determination, CS360 argued in its Request for

Reconsideration that its staffing levels were "consistent with its start-up nature," its "intention

[was] to hire employees to staff particular jobs as work comes in and contracts are awarded," and

"[i]t would not make business sense to fully staff CS360 until such time as it has the work to

justify the staffing."  VA00544.  Before this Court, the VA states that "[i]t is not unrealistic for

the VA to consider that Mr. Davis had not utilized any of the capital he has stated he had access

to, [sic] to hire, even temporarily, any employees to assist in the administrative functions of the concern at the time CS360 was actively bidding on VA contracts." Def.'s MTD Reply at 5.  But no such reasoning is found in the VA's contemporaneous written decisions.

### iv.    The Timing of CS360's Modifications to its Operating Documents

In denying CS360's Request for Reconsideration, the CVE relied in part on inferences that it drew from the timing of CS360's modifications to its operating documents.  In its Final Decision, the CVE first noted that CS360's Second Amended Operating Agreement modified the provisions governing management of the company and reflected that Blanco had withdrawn from CS360 altogether, and then proceeded to "question how [CS360] could have implemented and/or effected these changes as insufficient time elapsed between the changes in this submission and the version submitted prior to the request."  VA00701.  But the CVE's Final Decision does not provide an explanation as to why there was "insufficient time" for CS360 to make these changes or why this sequence of events would necessarily "evince an intent solely to bring CS360 within the letter of the regulation as opposed to having real meaning or purpose."  VA00701.

Notably, when it sustained a third-party protest as to CS360's status on April 30, 2010, the OSDBU raised a concrete concern about how Section 4.01(a) of the Operating Agreement could allow non-veterans to control the decisions of CS360 because the three non-veteran members of the Executive Committee could join with either Davis of Blanco to override the will of the other.  VA00387.  CS360 acted promptly in responding to this concern, modifying its Second Amended Operating Agreement twelve days later, on May 12, 2010.  VA00480-00523. The speed with which CS360 responded is perhaps unsurprising because the VA's own regulations prohibited CS360 from submitting offers on contracts set aside for SDVOSBs until it "demonstrate[d] that it has overcome the reasons for the determination of ineligibility."  48

C.F.R. § 819.307(c)(3).  In short, the VA created the incentives for fast action.  While that is not necessarily inconsistent with a finding that the timing of a company's response might be indicative of "impropriety," the CVE's Final Decision does not, on its face, give any consideration to the possibility that a company similarly situated to CS360 might want to promptly respond to any concerns identified by the agency in good faith in order to preserve its ability to bid on contracts set aside for SDVOSBs.  Because the VA identified a problem and then required CS360 to respond to that problem, it must now provide a more fulsome explanation as to why CS360's attempts to come into compliance "evince an intent solely to bring CS360 within the letter of the regulation as opposed to having real meaning or purpose."  VA00701.

Similarly, the CVE's Final Decision does not provide a satisfactory explanation as to why a period of twelve days would be "insufficient" to make bona fide changes to CS360's operating documents.  True, twelve days is not a substantial amount of time, but the process for modifying CS360's operating documents required a relatively small number of people to confer and reach an agreement as to any changes.  The CVE has not explained why it is reasonable to conclude that CS360's attempts to speak to the agency's concerns within twelve days "evince[s] an intent solely to bring CS360 within the letter of the regulation as opposed to having real meaning or purpose."  VA00701.  Given the cursory nature of the explanation provided in the CVE's Final Decision, the Court cannot simply ascribe this to a matter of agency expertise.

### v.   The Effect of Capital Contributions on Control

Meanwhile, there are aspects of the capital contribution problem that are left unaddressed by the CVE in its written decisions.  For example, Section 4.01(a) of the Second Amended Operating Agreement allocates to Davis the responsibility of managing the affairs of CS360, while Section 3.06 provides that "no Member shall have the right . . . [to] repayment of its

Capital Contributions." VA00542, VA00567.  Contrary to what the CVE appears to imply, the

interaction of these two provisions does not necessarily mean that the non-veteran members

relinquished any meaningful financial interest in CS360.  For instance, Section 5.03 of the

Second Amended Operating Agreement provides that "all funds of the Company which are

available for distribution may from time to time at the discretion of the Managing Member be

distributed pro rata to all Members in accordance with their respective Distribution Percentages."

VA00501.  The CVE has failed to provide an explanation as to why no "rational person" would

be willing to fund a start-up company with the expectation of receiving distributions in the

future, even where distribution decisions are entrusted to the discretion of the managing member.

To the extent the CVE intends to suggest that investment generally must be accompanied by

some level of control over a company's affairs, it must explain why it believes that to be the case

and indicate how it applies to CS360.[4]

* * *

The Court does not intend to suggest that the VA must provide an exceedingly exhaustive

explanation with respect to the foregoing matters or that it must individually rebut each and

every ground proffered by CS360 in its Request for Reconsideration.  However, in this case, the

defects in the VA's written decisions are so many and so significant that they affect the whole,

and preclude the Court from effectively exercising its review function.  *Cf. Braniff Airways, Inc.*

---

[4] In defending its decision before this Court, the VA cites to 38 C.F.R. § 74.4(i)(2) in support of the proposition that "the amount of critical financial support provided by a non-veteran is a legitimate cause for concern about the veteran's actual control." Def.'s MSJ Opp'n at 5. However, the provision relied upon by the VA allows the VA to consider whether "[a] non-veteran or entity, having an equity interest in the applicant or participant, provides critical financial or bonding support . . . *which directly or indirectly allows the non-veteran significantly to influence business decisions of the participant*." 38 C.F.R. § 74.4(i)(2) (emphasis added).  In other words, the VA's regulations appear to suggest that the magnitude of non-veterans' equity interest in a company is relevant to control insofar as it is accompanied by the ability to "influence business decisions."

*v. Civil Aeronautics Bd.*, 379 F.2d 453, 466-67 (D.C. Cir. 1967).  Given the ambiguous

relationship between the Initial Determination and Final Decision, the vague and generalized

explanations provided by the CVE on the administrative level, and the new explanations

proffered by the VA before this Court, the Court cannot say with any level of confidence that it

knows the precise grounds for the VA's decision to deny CS360's application for inclusion in the

VetBiz VIP database and whether those grounds would hold up under review.  Simply put, on

this sparse and disjointed record, the Court cannot find that the VA has "provided a 'rational

connection between the facts found and the choice made.'" *Int'l Union, United Mine Workers of

Am.*, 626 F.3d at 90 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

     Where, as here, the district court cannot evaluate the challenged action on the basis of the

record presented, and the agency may be able to cure any defects through further action, the

proper course is to remand to the agency for additional investigation or explanation.  *CSI

Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011).  Here, the

Court concludes that the VA has failed to provide a satisfactory contemporaneous explanation

for its decision to deny CS360's application and concludes that the best course is to **REMAND**

the action to the VA for further consideration and explanation.  On remand, the VA shall have

the discretion to reopen the administrative record, to engage in additional fact-finding, to

supplement its explanation, and to reach the same or a different ultimate conclusion.  *See

generally Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 76 (D.D.C. 2011).  The

Court emphasizes that it expresses no opinion, one way or the other, as to the ultimate merits of

the VA's decision to deny CS360's application for inclusion in the VetBiz VIP database.

**B.      Count II: Violation of the Due Process Clause of the Fourteenth Amendment**

In Count II, CS360 contends that the VA's process for considering applications for

inclusion in the VetBiz VIP database "is in violation of the Fourteenth Amendment of the United

States Constitution which prohibits the deprivation of 'any person of life, liberty, or property,

without due process of law.'" Compl. ¶ 50 (emphasis omitted).  In addition, CS360 alleges that

the VA's use of "inflammatory language" in its denial decision "constitutes a deprivation of

[CS360's] property or the liberty to enjoy rights which [it] would otherwise enjoy." *Id.* ¶ 51.

The Court concludes that Count II fails to state a plausible claim for relief.  Accordingly, it shall

be **DISMISSED**.

> **1.      CS360 Has Not Stated a Plausible Claim for Relief under the
>             Fourteenth Amendment**

As set forth in the Complaint, CS360 brings Count II solely under "the Fourteenth

Amendment of the United States Constitution." Compl. ¶ 50.  However, the VA is a federal

actor and the Fourteenth Amendment "does not apply to the federal government." *United States

v. Edwards*, 98 F.3d 1364, 1368 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1170 (1997).  Notably,

even though the VA raised this very argument in its Motion to Dismiss, *see* Def.'s MTD Mem. at

11 n.3, CS360 neither addressed the argument in its opposition nor sought to amend its

Complaint to correct the obvious infirmity.  To the extent CS360 believed it could simply amend

its Complaint through its opposition papers, it was mistaken. *See Arbitraje Casa de Cambio,

S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("[A] complaint may

not be amended by the briefs in opposition to a motion to dismiss.") (quotation marks omitted).

Count II, as it has been set forth in the Complaint, fails to state a plausible claim for relief.

Accordingly, it shall be **DISMISSED**.

**2.      CS360's Allegations Would Not State a Plausible Claim for Relief
under the Fifth Amendment**

Even assuming, *arguendo*, that CS360 brought Count II under the Fifth Amendment to

the United States Constitution, which unlike the Fourteenth Amendment does apply to the VA,

the claim would nonetheless fail to state a plausible claim for relief.  The Court addresses the two

components of the claim in turn.

### i.      Failure to Provide an Appeal to a Second Decision-maker

In the first part of Count II, CS360 contends that it has a "property interest in the

economic benefits that VA-approved SDVOSB status would bring" and that the VA "deprived

[CS360] of that SDVOSB status with no procedure or process for independent review . . . , such

as an appeal" to a different decision-maker.  Compl. ¶ 50.  In short, CS360 claims that it was

denied due process because it did not receive "an independent review of the initial denial." *Id.*[5]

For at least three reasons, the claim must fail.

First, CS360 has failed to state a plausible claim that it had a cognizable property interest

in being designated as an SDVOSB.  In this regard, the *only* argument offered by CS360 is that it

had "a property interest in remaining listed on the V.I.P." because it "had an ongoing business

operating under its placement on the V.I.P."  Pl.'s MTD Opp'n at 15.  In making this argument,

CS360 relies upon the United States Court of Appeals for the District of Columbia Circuit's

decision in *Jordan v. United Insurance Company of America*, 289 F.2d 778 (D.C. Cir. 1961), in

which the Court of Appeals held that "once a going business has been established on the basis of

---

[5]  In its opposition, CS360 raises an amorphous universe of other alleged infirmities with the
process it was provided on the administrative level. *See* Pl.'s MTD Opp'n at 13-16.  However,
Count II of the Complaint is unambiguously confined to a narrow claim that the VA deprived
CS360 of due process by failing to provide an appeal to an independent decision-maker. *See*
Compl. ¶ 50.  The Court limits its analysis accordingly. *See Arbitraje Casa de Cambio*, 297 F.
Supp. 2d at 170 ("[A] complaint may not be amended by the briefs in opposition to a motion to
dismiss.") (quotation marks omitted).

a license or certificate of authority, property rights attach." *Id.* at 781. However, the Complaint

is devoid of any allegation that CS360 was ever "licensed" or "certified" as an SDVOSB.

Indeed, the Complaint is unambiguous that the VA did not even rule upon CS360's application

for inclusion in the VetBiz VIP database until June 30, 2010, at which point the application was

denied. Compl. ¶ 25. Even assuming that CS360 was temporarily and provisionally listed in the

database on the basis of self-reporting, "that, by itself, did not create a constitutionally protected

right to continued [inclusion] absent a 'legitimate claim of entitlement.'" *Menkes v. U.S. Dep't*

*of Homeland Sec.*, 637 F.3d 319, 338 (D.C. Cir. 2011) (quoting *Bd. of Regents v. Roth*, 408 U.S.

564, 577 (1972)).

Second, to the extent it was required, CS360 was afforded all the process it was due. *See*

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is

the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting

*Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Even setting aside CS360's opportunity to be

heard on the third-party protest, CS360 was afforded the opportunity to submit written materials

in support of its initial application; it was afforded the opportunity to engage with the VA's

representative face-to-face during the onsite examination; CS360 was advised of the basis for the

VA's initial determination in a written decision; CS360 was afforded the opportunity to request

reconsideration and to submit additional materials in support of that request; CS360 was advised

of the basis for the VA's final decision in a written decision; and the VA provided a written

explanation for its final decision. Even after this process concluded, CS360 was still free to

request further reconsideration, but it elected not to do so. *See* 38 C.F.R. § 74.13(b). Moreover,

CS360 was able to begin the process anew a mere six months later by submitting a renewed

application. *See id.* at § 74.14. And, of course, CS360 was afforded the benefit of judicial

review under the APA.  Under these circumstances, to the extent process was required, CS360 received all the process to which it was due.

Third, in recognition that agencies' freedom to fashion their own procedural rules is "the very basic tenet of administrative law," the United States Supreme Court has been clear that a reviewing court may not impose upon the agency procedural requirements beyond those set forth by Congress or the agency itself.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524, 543-44, 549 (1978).  That limitation applies equally to informal adjudications like the one at issue in this case.  *Pension Benefit Guaranty Corp. v. LTV Corporation*, 496 U.S. 633, 654 (1990).  Accordingly, the Court declines CS360's invitation to engraft procedural requirements upon the VA's decision-making process that have not been required by Congress or the VA itself.

For the reasons set forth above, the Court finds that CS360 has failed to state a plausible claim for relief insofar as it alleges that it was denied due process because the VA failed to provide a means for applicants to appeal initial determinations to a second decision-maker.

### ii.       Inflammatory Language

In the second part of Count II, CS360 alleges that the VA's use of "inflammatory language" in its decisions resolving CS360's application "constitutes a deprivation of [CS360's] property or the liberty to enjoy rights which [it] would otherwise enjoy."  Compl.  ¶ 51.  The claim must fail for at least three reasons.  First, although the VA's Motion to Dismiss seeks the dismissal of Count II, CS360's opposition makes no attempt to defend this aspect of Count II.  Accordingly, the Court shall treat the matter as conceded.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004).  Second, CS360 has made no attempt to show that the mere use of "inflammatory

language" in an internal administrative decision can rise to the level of a constitutional deprivation. *See Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983) (suggesting that the deprivation "must involve a removal, extinguishment, or significant alteration of an interest."). Third, the CVE's Initial Determination and Final Decision, which are incorporated into the Complaint by reference, do not actually contain any "inflammatory language." For these three reasons, the Court finds that CS360 has failed to state a plausible claim for relief insofar as it alleges that CS360 was denied due process because the VA used "inflammatory language" in the decisions denying CS360's application.

In sum, the Court finds that CS360 has failed to state a plausible claim for relief for deprivation of due process under either part of Count II of the Complaint. Accordingly, Count II shall be **DISMISSED**.

### C.    Count III: Ultra Vires Regulations

In Count III, CS360 alleges that the VA has exceeded its statutory authority by enacting regulations that "for all practical purposes" authorize the VA's OSDBU to "certify" SDVOSBs. Compl. ¶ 53. In this regard, CS360's arguments are three-fold. For the reasons set forth below, the Court finds those arguments unavailing and concludes that CS360 has failed to state a plausible claim for relief. Accordingly, Count III shall be **DISMISSED**.

### 1.    The Authority of the VA

CS360 first alleges in broad terms that the regulations[6] issued by the VA governing the processing of applications for inclusion in the VetBiz VIP database are ultra vires because "[t]he relevant statute, 38 U.S.C.A. §§ 8127, 8128, requires only that . . . the VA simply verify that each small business concern listed in the database is owned and controlled by veterans" and

---

[6] CS360's arguments are consistently generalized, focusing on the regulations as a whole and not any particular regulations.

"[t]here is nothing in the statute that requires or authorizes the VA to be the entity that actually certifies the SDVOSBs." Compl. ¶ 53.  To the contrary, when Congress authorized the VA to set aside contracts for eligible veteran-owned small businesses, it was clear that the VA's authority could be exercised "only if the small business concern and the veteran owner of the small business concern are listed in [a] database of veteran-owned businesses." 38 U.S.C. § 8127(e).  Congress also made it clear that it expected the VA, in the course of creating and maintaining the VetBiz VIP database, to "verif[y] that . . . the small business concern is owned and controlled by veterans." *Id.* § 8127(f)(4)(A).  This is an express delegation of authority and the VA acted well within its powers by enacting regulations seeking to enforce this statutory command. *See id.* § 501(a) ("The Secretary has authority to prescribe all rules and regulation which are necessary or appropriate to carry out the laws administered by the Department.").  Accordingly, Count III cannot rest on this basis.

### 2.    The Authority of the SBA

CS360 next argues in broad terms that the regulations issued by the VA are ultra vires because the authority to certify SDVOSBs "has already been granted exclusively to the U.S. Small Business Administration (SBA) pursuant to 15 U.S.C. § 657f." Compl. ¶ 53.  True, Congress charged the SBA with establishing procedures relating to the verification of SDVOSBs seeking an award of certain sole source contracts. *See* 15 U.S.C. § 657f(d) (incorporating 15 U.S.C. § 637(m)(5)-(6) by reference).  However, through a separate and subsequent enactment, Congress independently authorized the VA to set aside contracts for veteran-owned small businesses and provided that the VA may award such contracts "only if the small business concern and the veteran owner of the small business concern are listed in [a] database of veteran-owned businesses." 38 U.S.C. § 8127(e).  To this end, Congress expressly and unambiguously

required the VA to "maintain a database of small business concerns owned and controlled by

veterans and the veteran owners of such business concerns." *Id.* § 8127(f)(1).  In so doing,

Congress made it absolutely clear that it expected the VA to "verif[y] that . . . the small business

concern is owned and controlled by veterans." *Id.* § 8127(f)(4)(A).  This is an express delegation

of authority and the VA acted well within its powers by enacting regulations seeking to enforce

this statutory command. *See id.* § 501(a) ("The Secretary has authority to prescribe all rules and

regulation which are necessary or appropriate to carry out the laws administered by the

Department.").  Accordingly, Count III cannot rest on this basis either.

### 3.   The Role of the OSDBU

Finally, in opposition to the VA's Motion to Dismiss, CS360 argues that the VA has

violated 15 U.S.C. § 644(k) by designating the OSDBU as the entity responsible for evaluating

applications for inclusion in the VetBiz VIP database. *See* Pl.'s MTD Opp'n at 16.  According to

CS360, "the functions of a federal OSDBU are dictated by statute and the VA OSDBU exceeds

the authority granted to such offices" because "[n]one of the statutory functions are [sic] even

remotely related to acting as a national certification office." *Id.*  There are at least two problems

with CS360's reliance upon 15 U.S.C. § 644(k) in support of Count III.  First, Count III does not

allege a violation of 15 U.S.C. § 644(k), but is instead limited to alleged violations of 15 U.S.C.

§ 657f and 38 U.S.C. §§ 8127-8128. *See* Compl. ¶¶ 53-54.  CS360 cannot amend its Complaint

merely by injecting new claims in the course of briefing a dispositive motion. *Arbitraje Casa de

Cambio*, 297 F. Supp. 2d at 170.  Second, 15 U.S.C. § 644(k) "established in each Federal

agency having procurement powers an office to be known as the 'Office of Small and

Disadvantaged Business Utilization.'"  Although the statute proceeds to identify the powers and

responsibilities of such offices, nothing in 15 U.S.C. § 644(k) suggests that those powers are

limiting and not illustrative.  Indeed, the statute provides that the OSDBU shall "be responsible to, and report directly to, the head of [the] agency," 15 U.S.C. § 644(k)(3), and CS360 has failed to provide any argument, let alone a colorable argument, as to why the Secretary of the VA's delegation of his authority under 38 U.S.C. §§ 8127-8127, is impermissible.  Accordingly, Count III cannot rest on this basis.

For the reasons set forth above, the Court finds that CS360 has failed to state a plausible claim for relief in Count III.  Accordingly, the claim shall be **DISMISSED**.

### III.  CONCLUSION

For the reasons set forth above, CS360's [13] Motion for Summary Judgment shall be **GRANTED-IN-PART** and **DENIED-IN-PART** and the VA's [15] Motion to Dismiss shall be **GRANTED-IN-PART** and **DENIED-IN-PART**.  Specifically, CS360's [13] Motion for Summary Judgment shall be **GRANTED** insofar as it seeks remand of this action based on the VA's failure to provide a satisfactory contemporaneous explanation for its decision to deny CS360's application for inclusion in the VetBiz VIP database and the motion shall otherwise be **DENIED**.  Meanwhile, the VA's [15] Motion to Dismiss shall be **GRANTED** insofar as it seeks the dismissal of Counts II and III of the [1] Complaint for failure to state a plausible claim for relief and the motion shall otherwise be **DENIED**.

/

/

/

/

/

/

The Court shall **REMAND** this action to the VA for further consideration and explanation.  On remand, the VA shall be free to exercise its discretion to reopen the administrative record, to engage in additional fact-finding, to supplement its explanation, and to reach the same or a different ultimate conclusion.  The Court shall require the parties to provide a Joint Status Report advising the Court of the status of the proceedings on remand by no later than **April 30, 2012**.


Date:   March 6, 2012

                                        _____/s/_____
                                        **COLLEEN KOLLAR-KOTELLY**
                                        United States District Judge